[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-13274

Non-Argument Calendar

_____

DERRICK JAMES WILLIAMSON, JR.,

Plaintiff-Appellant,

*versus*

ALABAMA DEPARTMENT OF MENTAL HEALTH AND
MENTAL RETARDATION,
COMMISSIONER LYNN BESHEAR,
DR. TAMMIE MCCURRY,
LYNN HUBBARD,
Director of Human Resources,
KIMBERLY MCALPINE, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 7:19-cv-00669-LSC

_____

Before JORDAN, BRANCH, and MARCUS, Circuit Judges.

PER CURIAM:

Derrick Williamson, proceeding *pro se*, appeals the district court's order granting summary judgment in full on claims he brought under the First and Fourteenth Amendments, 42 U.S.C. §§ 1981, 1983, 1985, 1986, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and state law. The operative complaint -- which is 174 pages long and contains 891 paragraphs -- arose out of his employment as a Mental Health Security Officer with the Alabama Department of Mental Health and Mental Retardation ("ADMH"). He sued various individuals associated with the ADMH (the "ADMH defendants") and Jacqueline Graham, Director of the State of Alabama Personnel Department. ADMH ran and staffed the medical facility in Tuscaloosa, Alabama, where Williamson was employed in the police services division, which guarded the facility's property, patients and employees.

In general, Williamson's claims are based on several disagreements he had with the ADMH and its officials. So, for example, his complaint alleges that in March 2018, Captain Bobby

Anderson reprimanded him for violating a policy governing the ADMH's internal advocacy program after Williamson sent a proposed legislative bill to the Alabama State Employee Association ("ASEA"). The bill sought to expand the authority of, and appropriate a $12 daily allotment for all Mental Health Security Officers. Then, in September 2018, Facility Director Annie Jackson reprimanded Williamson for allegedly violating a policy governing how employees should respond to emergency situations within the facility, claiming that he had ended emergency protocols before an emergency had actually ended. And in February 2019, Jackson suspended Williamson for five days without pay after he allegedly used the facility's surveillance equipment for personal reasons.

Williamson's complaint also discusses an external complaint he sent to the Alabama Peace Officers Training Commission ("APOSTC"), voicing concerns about another officer's training. It adds that he unsuccessfully applied for promotions within the ADMH and that he received negative performance reviews, which said he "partially meets standards." Relying on these instances and others, Williamson brought: (a) First Amendment speech, prior-restraint, and association claims; (b) Title VII disparate-treatment, failure-to-promote, retaliation, and retaliatory-hostile-work-environment claims; (c) a procedural due process claim; (d) an Equal Protection Clause claim; and (e) § 1985 conspiracy claims.

On appeal, Williamson argues that: (1) all of his claims should have survived summary judgment but the district court erroneously made credibility determinations, failed to consider the

evidence, ignored some of his claims, and committed "inadvertence" by maintaining a preconceived notion against him as a *pro se* litigant; and (2) the district court abused its discretion in dismissing his state-law claims.  After careful review, we affirm.

## I.

We review the grant of summary judgment *de novo*, viewing all facts and drawing all reasonable inferences in the light most favorable to the non-movant.  *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under this standard, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A genuine issue of material fact exists when a reasonable factfinder could find by a preponderance of the evidence that the non-movant is entitled to a verdict.  *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012).  "[A] mere 'scintilla' of evidence supporting the opposing party's position will not suffice."  *Gogel v. Kia Motors Mfg. of Ga.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (*en banc*).  Further, "mere conclusions and unsupported factual allegations, as well as affidavits based, in part, upon information and belief, rather than personal knowledge, are insufficient to withstand" summary judgment.  *Ellis v. England*, 432 F.3d 1321, 1327 (11th Cir. 2005).

21-13274              Opinion of the Court                    5

We review a district court's decision not to exercise supplemental jurisdiction for abuse of discretion. *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 738 (11th Cir. 2006).

"[A]lthough we are to give liberal construction to the pleadings of *pro se* litigants, 'we nevertheless have required them to conform to procedural rules.'" *Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007). For example, "issues not briefed on appeal by a *pro se* litigant are deemed abandoned." *Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008). "A party fails to adequately 'brief' a claim when he does not 'plainly and prominently' raise it, 'for instance by devoting a discrete section of his argument to those claims.'" *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014). We've "long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority." *Id.* Further, "simply stating that an issue exists, without further argument or discussion, constitutes abandonment of that issue and precludes our considering the issue on appeal." *Singh v. U.S. Att'y Gen.*, 561 F.3d 1275, 1278 (11th Cir. 2009). In short, any issue "an appellant wants the Court to address should be specifically and clearly identified in the brief." *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004).

## II.

### A.

First, we find no merit to Williamson's arguments concerning his First Amendment claims.  It is well established that the state may not demote or discharge a public employee in retaliation for speech protected under the First Amendment.  *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989).  In analyzing a plaintiff's First Amendment retaliation claim, we first consider whether the plaintiff's speech was made as a citizen and whether it implicated a matter of public concern.  *Moss v. City of Pembroke Pines*, 782 F.3d 613, 617 (11th Cir. 2015).  If so, we then weigh the plaintiff's interests in free speech against the government's interest in regulating speech to promote the efficiency of the public services it performs through its employees.  *Id.* at 618.  These two inquiries are questions of law decided by the court, and the court's resolution determines whether the plaintiff's speech is protected by the First Amendment.  *Id.*  Third, the plaintiff must show that his speech was a substantial motivating factor in the alleged adverse employment action.  *Id.*  Finally, if the plaintiff makes this showing, the burden shifts to the government to prove that it would have taken the adverse actions even absent the plaintiff's speech.  *Id.*

For part one of the analysis, if the employee was speaking as an employee rather than a citizen, then there is no First Amendment issue and the constitutional inquiry ends.  *Boyce v. Andrew*, 510 F.3d 1333, 1342–43 (11th Cir. 2007) (discussing *Garcetti v. Ceballos*, 547 U.S. 410 (2006)).  "The central inquiry is whether the speech at issue 'owes its existence' to the employee's professional responsibilities."  *Moss*, 782 F.3d at 618 (quoting *Garcetti*, 547 U.S.

at 421). "Factors such as the employee's job description, whether the speech occurred at the workplace, and whether the speech concerns the subject matter of the employee's job may be relevant, but are not dispositive." *Id.* But "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee -- rather than citizen -- speech." *Lane v. Franks*, 573 U.S. 228, 240 (2014). Rather, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.*

"The second requirement -- that the speech address a matter of public concern -- concerns the context of the speech and asks whether the employee spoke on a matter of public concern or on matters of only personal interest." *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1162 (11th Cir. 2015). In order to address a matter of public concern, the "employee's speech must relate to any matter of political, social, or other concern to the community." *Id.* (quotations omitted). That "inquiry turns on the content, form, and context of a given statement, as revealed by the whole record." *Id.* (quotations omitted). We've "recognized that an employee's speech will rarely be entirely private or entirely public," so, "in reviewing the whole record, [w]e ask whether the main thrust of the speech in question is essentially public in nature or private." *Id.* (quotations omitted). Ultimately, the plaintiff bears the burden of proving that his speech addresses a matter of public concern. *Maples v. Martin*, 858 F.2d 1546, 1552 n.9 (11th Cir. 1988).

If we determine that the plaintiff spoke as a citizen on a matter of public concern, we conduct a balancing test to weigh the employee's free speech interest against "the interest of the [s]tate, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). In so doing, we consider the manner, time, and place of the speech, plus the context in which it arose. *Moss*, 782 F.3d at 621. We also consider whether the statement (1) impairs discipline by superiors or harmony amongst coworkers, (2) has a detrimental impact on close working relationships for which loyalty and confidence are necessary, or (3) impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise. *Id.* The government's interest in avoiding disruption does not require proof of actual disruption and proof of a reasonable possibility of adverse harm is sufficient. *Id.* at 622. Further, when an employee violates a specific rule or regulation to which he is subject, the government employer's position is strengthened. *Thaeter v. Palm Beach Cnty. Sheriff's Off.*, 449 F.3d 1342, 1354–55 (11th Cir. 2006).

In applying *Pickering*, we consider the special concerns inherent in running quasi-military organizations like police units, including the heightened need for order, loyalty, morale, and harmony. *See Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1293 (11th Cir. 2000) ("In a law enforcement agency, there is a heightened need for order, loyalty, morale and harmony, which affords a police department more latitude in responding to the speech of its

21-13274                Opinion of the Court                    9

officers than other government employers."); *Anderson v. Burke Cnty.*, 239 F.3d 1216, 1222 (11th Cir. 2001) ("[A] paramilitary organization" like a fire department "has a need to secure discipline, mutual respect, trust and particular efficiency among the ranks due to its status as a quasi-military entity different from other public employers." (quotations omitted)).  In fact, "the state's interest in regulating the conduct of its employees is perhaps at its greatest where paramilitary organizations, such as a *police force*, are involved."  *Thaeter*, 449 F.3d at 1354 n.10 (quotations omitted).

"A prior restraint on speech prohibits or censors speech before it can take place."  *Cooper v. Dillon*, 403 F.3d 1208, 1215 (11th Cir. 2005).  When analyzing the validity of a prior restraint, we must "'arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [s]tate, as an employer, in promoting the efficiency of the public services it performs through its employees.'"  *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 465–66 (1995).

The First Amendment also protects the right of a public employee to associate.  "Because none of the great liberties insured by the First Amendment can be given higher place than the others, the requirement of *Garcetti* applies to the right of a public employee to associate as it applies to the rights of a public employee to speak and to petition the government."  *D'Angelo v. Sch. Bd. of Polk Cnty.*, 497 F.3d 1203, 1212 (11th Cir. 2007) (brackets and quotations omitted).  Yet government employers still need a significant degree of control over their employees' words and actions, including their

associational activity as employees. *Id.* at 1213. So, "[r]estricting associational activity that is not undertaken as a citizen, but that owes its existence to a public employee's professional responsibilities[,] . . . . simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* (quotations omitted) (holding that a teacher's right to associate was not protected by the First Amendment when his efforts to convert a school to charter status were not undertaken as a citizen).

Qualified immunity is an affirmative defense that shields government officials from civil liability in their individual capacities in certain circumstances. *Kesinger v. Herrington*, 381 F.3d 1243, 1247–48 (11th. Cir. 2004). If the official shows that he acted within the scope of his discretionary authority, the plaintiff must attempt to overcome the qualified immunity defense by showing that: (1) the defendant violated a constitutional right, and (2) the violation of the right was clearly established. *Id.* at 1248.

## B.

Here, the district court properly granted summary judgment to the defendants on Williamson's First Amendment freedom-of-speech claims. In general, Williamson argues that the district court failed to address every instance of speech upon which he based his claim. However, the only specific instance he mentions is the complaint he made to the APOSTC about another officer, but he does not explain how the content of his complaints was a matter of public concern, so he has abandoned this issue. *See Singh*, 561 F.3d at 1278. While matters of corruption,

discrimination, and politics would satisfy the public concern prong, Williamson bears the burden of proving that his complaints addressed a matter of public concern, which he did not do. *See Alves*, 804 F.3d at 1162; *Maples*, 858 F.2d at 1552 n.9. Moreover, because Williamson does not identify which other instances of speech the district court ignored, he has abandoned this issue as well.

## C.

The district court also properly granted summary judgment as to his First Amendment prior-restraint claim. This claim involves the reprimand he received from Captain Anderson after he submitted a proposed legislative bill to the ASEA that sought to expand the authority of, and appropriate a $12 daily allotment for all Mental Health Security Officers. In the reprimand, Captain Anderson criticized him for sending the proposed bill without prior approval and barred him from sending any information about the ADMH to other agencies without approval of the facility's director.

We agree that Anderson's directive likely amounted to a prior restraint, since it prevented Williamson from speaking about the ADMH -- a matter that potentially was of public concern -- without prior approval. *See Cooper*, 403 F.3d at 1215; *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1223 (11th Cir. 2017) ("The Policy . . . is a prior restraint and not a subsequent punishment because it *prevents* members of the public from speaking at a Board meeting unless they comply with the Policy's requirements.").

Nevertheless, Williamson was employed as a Mental Health Security Officer with the ADMH. *See* Ala. Code § 22-50-21 (providing that "[t]he State Mental Health Officer may appoint or employ one or more suitable persons to act as police officers . . . on the property of state mental health facilities or hospitals," and "[s]uch officers shall be charged with all the duties and invested with all the powers of police officers"). As a quasi-military organization, the ADMH's interest in promoting efficiency and regulating its employees outweighed Williamson's interest in the speech. *See Nat'l Treasury Emps. Union*, 513 U.S. at 465–66; *Thaeter*, 449 F.3d at 1354 n.10. Moreover, Anderson instituted the directive *after* Williamson repeatedly violated an ADMH policy that governed its legislative process, further strengthening the ADMH defendants' position. *See Thaeter*, 449 F.3d at 1354–55. As for Williamson's argument that he was not being disruptive when Anderson imposed the directive, the ADMH's interest in avoiding disruption does not require proof of *actual* disruption. *See Moss*, 782 F.3d at 622.

Relatedly, the individual ADMH defendants were entitled to qualified immunity as to the prior-restraint claims. As we've held, "a governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public." *Thaeter*, 449 F.3d at 1354 (quotations omitted). And importantly, Williamson cites no binding precedent holding that a directive like the instant one is unconstitutional, so he cannot show that the defendants violated a clearly established constitutional right. *See Kesinger*, 381 F.3d at 1247–48.

### D.

Nor did the district court err in granting summary judgment as to Williamson's right-to-associate claim. This claim, like his prior-restraint claim, is based on the proposed legislation he sent to the ASEA, to enhance the authority of and daily allotments for Mental Health Security Officers, which was the position he held. So though we've "long held that, unlike speech or petitions by public employees, associational activity by public employees need not be on matters of public concern to be protected under the First Amendment," *D'Angelo*, 497 F.3d at 1212, his associational activity was not undertaken as a citizen in this case. Rather, his activity owed its existence to his public employment; as a result, it was not protected by the First Amendment. *Id.* at 1213. For these reasons, we affirm the court's order as to all of the First Amendment claims.

### III.

### A.

We also are unconvinced by Williamson's arguments concerning his Title VII claims. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). There are two theories of intentional discrimination under Title VII: disparate treatment and

pattern or practice discrimination. *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000).

Disparate treatment occurs when an employer treats a particular person less favorably than others because of a protected trait. *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). These kinds of claims require proof of discriminatory intent either through direct or circumstantial evidence. *Joe's Stone Crab*, 220 F.3d at 1286. Absent direct evidence of discrimination, we apply the burden-shifting framework found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* To establish a *prima facie* case of disparate treatment under that framework, a plaintiff must show that: (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) his employer treated similarly situated employees more favorably; and (4) he was qualified to do the job. *Id.*

To meet the third prong, a comparator must be "similarly situated in all material respects," meaning that he and the plaintiff must be "sufficiently similar, in an objective sense" and "cannot reasonably be distinguished." *Lewis v. City of Union City*, 918 F.3d 1213, 1218, 1228 (11th Cir. 2019) (en banc) (quotations omitted). This standard requires a case-by-case analysis, and minor differences in job functions between a plaintiff and a comparator are not dispositive as to whether they are similarly situated. *Id.* at 1227. Ordinarily, a similarly situated comparator will have engaged in the same basic conduct as the plaintiff; have been subject to the same employment policy; ordinarily have had the same supervisor; and share the plaintiff's employment or disciplinary history. *Id.*

If the plaintiff makes a *prima facie* case, the defendant bears the burden of producing a legitimate, non-discriminatory reason for its employment action. *Joe's Stone Crab*, 220 F.3d at 1286. Defying the chain of command and insubordination, for instance, are legitimate reasons for discipline. *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1327 (11th Cir. 2020) ("Promoting the chain of command and punishing insubordination are legitimate, important concerns for a police force."). An employer successfully rebuts a *prima facie* case of disparate treatment by showing that it honestly believed the employee committed a violation, and an admission of misconduct provides sufficient foundation for an employer's good faith belief that the employee engaged in the misconduct. *Abel v. Dubberly*, 210 F.3d 1334, 1338 (11th Cir. 2000). "An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001) (quotations omitted).

If the employer offers a legitimate, non-discriminatory reason, the plaintiff then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination. *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1347 (11th Cir. 2007). A reason is not pretext "unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Id.* at 1349 (quotations omitted). A plaintiff can show pretext by exposing "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" in the proffered reasons that a reasonable factfinder

could find them unworthy of credence. *Id.* at 1348. A plaintiff cannot establish pretext "merely by questioning the wisdom of the employer's reason as long as the reason is one that might motivate a reasonable employer." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001) (quotations omitted). If a proffered reason is one that might motivate a reasonable employer, the employee must meet the reason "head on" and rebut it. *Chapman*, 229 F.3d at 1030. If multiple reasons are given, the plaintiff must rebut each one. *Id.* at 1037.

Outside of the burden-shifting framework, a plaintiff may still survive summary judgment by presenting "a convincing mosaic" of circumstantial evidence that raises a reasonable inference that the employer discriminated against him. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (quotations omitted). Accordingly, a "plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." *Id.* As long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper. *See id.* ("[T]he plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.").

In the failure-to-promote context, a *prima facie* case of Title VII discrimination consists of showing that: (1) the plaintiff belongs to a protected class; (2) he applied for and was qualified for a promotion; (3) he was rejected despite his qualifications; and (4) other equally or less-qualified employees *outside* his class were

promoted. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010). The comparators for the fourth prong must be similarly situated in all relevant respects. *Id.* "In the context of a promotion, a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the [person] who received the position he coveted." *Springer*, 509 F.3d at 1349 (quotations omitted). Instead, he "must show that the disparities between the successful applicant's and his own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Id.* (quotations omitted).

Title VII also prohibits an employer from retaliating "against any . . . employee[] . . . because he has opposed any practice made an unlawful employment practice by" Title VII, "or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of Title VII retaliation, the plaintiff must show that "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) he established a causal link between the protected activity and the adverse action." *Brown*, 597 F.3d at 1181. The first prong protects "proceedings and activities which occur in conjunction with or after the filing of a formal charge with the [Equal Employment Opportunity Commission ('EEOC')]." *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000).

"[I]n the context of a Title VII retaliation claim, a materially adverse action means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008) (quotations omitted). We've held that a poor performance review that affected an employee's eligibility for pay raises was a materially adverse action. *Id.* However, we've suggested that the decision to reprimand or transfer an employee, if rescinded before the employee suffered a tangible harm, is not an adverse action. *Pennington*, 261 F.3d at 1267. Further, warnings that the plaintiff's job is in jeopardy do not constitute materially adverse actions. *Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010).

"The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Pennington*, 261 F.3d at 1266 (quotations omitted). The relatedness between the protected activity and adverse action may be demonstrated by a close temporal proximity between them. *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716–17 (11th Cir. 2002). However, we've "cautioned that mere temporal proximity, without more, must be very close to suggest causation in a Title VII retaliation case." *Johnson*, 948 F.3d at 1327–28 (quotations and brackets omitted). For example, "[a] three-to-four-month disparity between protected conduct and an adverse employment action is insufficient to establish pretext," but "a two-week disparity can be evidence that the proffered reason was pretextual." *Id.* at 1328 (holding that an

almost two-month disparity between the protected conduct and the adverse employment action was insufficient, standing alone, to establish pretext). Nevertheless, "even when the disparity is only two weeks, we have suggested that such proximity is 'probably insufficient to establish pretext by itself.'" *Id.* (quotation omitted).

We've also recognized a retaliatory-hostile-work-environment claim under Title VII -- that is, a claim that the plaintiff was subjected to a hostile work environment based on a retaliatory motive. *See Gowski v. Peake*, 682 F.3d 1299, 1311–12 (11th Cir. 2012), *abrogation in other respects recognized by Monaghan v. Worldpay U.S. Inc.*, 955 F.3d 855, 861 (11th Cir. 2020). In *Monaghan*, we observed that a retaliatory-hostile-work-environment claim was, for Title VII purposes, a form of retaliation. 955 F.3d at 861–63. Thus, retaliatory-hostile-work-environment claims are analyzed like retaliation claims and may succeed if the conduct complained of "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.*

**B.**

Here, the district court properly granted summary judgment as to Williamson's Title VII discrimination claims. Even assuming, arguendo, that he could prove a *prima facie* case of discrimination -- based on his claim that he suffered adverse employment actions when Anderson reprimanded him in May 2018 and when he received negative performance reviews -- the ADMH defendants gave legitimate, non-discriminatory reasons for their actions. *See Joe's Stone Crab*, 220 F.3d at 1286. Specifically,

Anderson reprimanded Williamson *after* he failed to receive approval from the facility director to send his proposed bill, in violation of ADMH policy -- indeed, defying the chain of command and insubordination are legitimate reasons for discipline. *See Johnson*, 948 F.3d at 1318. As for the negative performance reviews, Williamson admits to the misconduct underlying the reprimands that led to his negative reviews, which provides a sufficient foundation for the defendants' belief that he engaged in the misconduct. *See Abel*, 210 F.3d at 1338. And Williamson does not provide any evidence that those reasons were pretext for unlawful discrimination. *See Joe's Stone Crab*, 220 F.3d at 1286; *Springer*, 509 F.3d at 1349. We affirm the district court's order as to the discrimination claims.

## C.

Nor did the district court err in granting summary judgment as to Williamson's failure-to-promote claims. The parties do not dispute that he established a *prima facie* case of discrimination for two of the positions he sought -- Mental Health Special Agent I and Mental Health Security Officer III. However, the ADMH defendants gave legitimate, non-discriminatory reasons for his non-promotions. As for the Mental Health Special Agent I position, the defendants disclosed that Williamson was not chosen because the other candidate had superior interview performance and law enforcement experience, which are legitimate, non-discriminatory reasons. *See Joe's Stone Crab*, 220 F.3d at 1286; *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983) (noting that "the defendant's burden is merely one of production, not proof,"

21-13274                Opinion of the Court                21

and is "exceedingly light" (quotations omitted)). And Williamson's bare claim that he was more qualified than the other candidate is insufficient to establish pretext. *See Springer*, 509 F.3d at 1349.

As for the Mental Health Security Officer III position, the ADMH defendants said that Williamson was not selected because they believed the other candidate had superior supervisory and ADMH experience, which is a legitimate, non-discriminatory reason. *See Joe's Stone Crab*, 220 F.3d at 1286; *Perryman*, 698 F.2d at 1142. And, again, Williamson has not shown that the ADMH defendants' proffered reasons were pretext for discrimination.

As for the other Mental Health Security Officer III position at Bryce Hospital, Williamson cannot establish a *prima facie* case because another African American was selected for the position. As a result, he cannot show that a "less-qualified employee[] outside h[is] class w[as] promoted." *See Brown*, 597 F.3d at 1174. We affirm the district court's order as to the failure-to-promote claims.

## D.

The district court also properly granted summary judgment as to his Title VII retaliation claim. Even assuming, arguendo, that Williamson established a *prima facie* case of retaliation under Title VII, the ADMH defendants provided legitimate, non-discriminatory reasons for the disciplinary actions he challenges on appeal -- the reprimand from Anderson in May 2018 and another reprimand he received in September 2018. *See Brown*, 597 F.3d at 1181; *Joe's*

*Stone Crab*, 220 F.3d at 1286.[1] We've already determined that the defendants gave legitimate, non-discriminatory reasons for the May 2018 reprimand from Anderson, and Williamson cannot show that those reasons were pretext for discrimination. Further, Williamson concedes that the misconduct underlying the September 2018 reprimand occurred, which provides a sufficient foundation for the defendants' belief that he engaged in the misconduct. *See Abel*, 210 F.3d at 1338. As for Williamson's argument that the temporal proximity of the September 2018 reprimand and his August 2018 EEOC charge warranted a jury trial, there was almost a month disparity, which is insufficient to establish pretext in these circumstances. *See Johnson*, 948 F.3d at 1327–28. We affirm the district court's order as to the Title VII retaliation claim.

### E.

Similarly, the district court did not err by granting summary judgment as to his Title VII retaliatory-hostile-work-environment claim. Notably, the district court applied the correct standard from our decision in *Monaghan* -- requiring a showing of conduct that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 955 F.3d at 861–63. Moreover, because we've already held that Williamson's Title VII retaliation claim failed to show that the defendants retaliated against

---

[1] Williamson abandoned any other allegedly adverse actions because he did not raise them on appeal. *See Timson*, 518 F.3d at 874.

him, it follows that his retaliatory-hostile-work-environment claim fails as well. *Id.* We affirm the order in this respect too.

## IV.

The district court also did not err in granting summary judgment as to Williamson's procedural-due-process claim. A § 1983 claim alleging a procedural due process violation requires proof of: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). First, "[i]n order for [a] plaintiff to have been entitled to the safeguards of procedural due process, he must have had a property interest in his employment, that is, a 'legitimate claim of entitlement' to his continued state employment." *Blanton v. Griel Mem'l Psychiatric Hosp.*, 758 F.2d 1540, 1542 (11th Cir. 1985). To assess whether a plaintiff has a property interest in his job, courts refer "to the state law which contains the terms and conditions of [the] plaintiff's employment." *Id.* at 1543. For example, "[i]t is well settled that a permanent employee in the classified service, whose employment may be terminated only for cause, has a property interest in his continued employment, and is entitled to due process protections." *Id.* at 1542. However, "a state employee who may be discharged at will under state law does not have a property interest in his continued employment, and is not entitled to the protections of due process." *Id.* at 1543. Further, "a prospective promotion is not a property . . . interest protected by the [F]ourteenth [A]mendment." *Wu v. Thomas*, 847 F.2d 1480, 1485 (11th Cir. 1988).

Under the Alabama Merit System Act, positions in the state service are "divided into the exempt, the unclassified, and the classified service." Ala. Code § 36-26-10(a). Relevant here, the exempt service includes, "[f]or each agency, up to two employees in addition to any other exempt positions as otherwise allowed by law." *Id.* § 36-26-10(b)(10). The classified service, in turn, includes "all other officers and positions in the state service." *Id.* § 36-26-10(d).

The ADMH is statutorily authorized to decide which employment positions to include in and exclude from the Merit System. *Id.* § 22-50-41; *Vaughn v. Shannon*, 758 F.2d 1535, 1537 (11th Cir. 1985) ("[T]he Director of the [ADMH] has the authority to determine which positions would be included in the Merit System and which would be excluded."). The ADMH must "employ individuals to exempt positions only through an open and competitive process," and the "recruitment, selection, and advancement of exempt employees will be based upon job related factors." Ala. Admin. Code r. 580-6-36-.05. Notably, positions exempt from the Merit System have no property interest in continued employment. *See Vaughn*, 758 F.2d at 1537 (holding that because the plaintiff's position was "exempt from the Merit System," he lacked "the property interest that would entitle him to due process").

Here, Williamson did not have a property interest in his continued employment because his position as Mental Health Security Officer II was exempt from the Merit System. *See id.* As we've noted, the ADMH is authorized to decide which employees are excluded, and the defendants submitted evidence that Williamson's

21-13274              Opinion of the Court              25

position was exempt -- including the job posting, describing the job as "a non-merit system position," and an affidavit from Director Graham of the state's Personnel Department. *See* Ala. Code § 22-50-41; *Vaughn*, 758 F.2d at 1537 (considering "the affidavits of the defendants, which stated that plaintiff was an exempt employee, and [Ala.] Code §§ 22-50-41 and 22-50-16, and conclud[ing] that plaintiff was exempt"). He does not reveal how the defendants "falsified" those documents. And to the extent he says his position as a police officer fell under the Merit System, we disagree. Even if he had authority to "act" like a police officer, he was still subject to the ADMH's classification of his position as a Mental Health Security Officer II. *See* Ala. Code §§ 22-50-21; 22-50-41; 36-26-10(b)(10).

Further, Williamson did not have a property interest in any prospective promotion to Mental Health Security Officer III. *See Wu*, 847 F.2d at 1485. Thus, his claim that he was entitled to a competitive process for his promotion is meritless because he is challenging the selection process, which is not examined in the absence of a constitutionally protected property interest. *See Grayden*, 345 F.3d at 1232. For these reasons, we affirm the district court's order as to Williamson's procedural-due-process claim.[2]

V.

---

[2] As for any challenge to the court's ruling that he had no constitutionally recognized *liberty* interest, he expressly waived it. *See United States v. Campbell*, 26 F4th 860, 872 (11th Cir. 2022) (*en banc*).

The district court likewise did not err in granting summary judgment as to Williamson's equal protection claim. "[T]he Equal Protection Clause requires government entities to treat similarly situated people alike." *Campbell v. Rainbow City*, 434 F.3d 1306, 1313 (11th Cir. 2006). In a traditional employment case brought under the Equal Protection Clause, an employee claims that he was discriminated against on account of his membership in an identifiable or constitutionally protected class, like race, religion, sex, or national origin. *Sweet v. Sec'y, Dep't of Corr.*, 467 F.3d 1311, 1318–19 (11th Cir. 2006). Equal Protection Clause discrimination claims are subject to the same standards of proof and use the same framework as intentional discrimination claims brought under Title VII and § 1981. *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009). So, to establish a violation of the Equal Protection Clause, a plaintiff must prove discriminatory motive or purpose. *Whiting v. Jackson State Univ.*, 616 F.2d 116, 122 (5th Cir. 1980).[3]

Here, even if we assume, arguendo, that law enforcement officers are an identifiable or constitutionally protected class, Williamson cannot show that the defendants acted with a discriminatory motive or purpose. *See id.*; *Sweet*, 467 F.3d at 1318–19. As we've detailed, the defendants gave non-discriminatory reasons for each of their decisions, and he has not shown otherwise. We affirm the district court's order as to his equal protection claims.

---

[3] We are bound by all Fifth Circuit decisions issued before October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

## VI.

Next, the district court did not err by granting summary judgment as to Williamson's § 1985 conspiracy claims. Section 1985 covers conspiracies to interfere with civil rights. *See* 42 U.S.C. § 1985. Relevant here, one subsection provides a cause of action for conspiracies "for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws." *Id.* § 1985(2). Another subsection, in relevant part, provides a cause of action to victims of conspiracies to deprive any person or class or persons of the equal protection of the laws, or of equal privileges and immunities under the laws. *Id.* § 1985(3).

> The elements of a cause of action under § 1985(3) are:
> (1) a conspiracy, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy, (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Childree v. UAP/GA AG Chem., Inc.*, 92 F.3d 1140, 1146–47 (11th Cir. 1996). To prove the second element, the plaintiff must show

that a racial or class-based animus motivated the conspirators' actions. *Park v. City of Atlanta*, 120 F.3d 1157, 1161 (11th Cir. 1997).

Under the "intracorporate conspiracy doctrine," a corporation's employees, when acting as agents of the corporation, are considered incapable of conspiring among themselves. *Dickerson v. Alachua Cnty. Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000). This doctrine also applies "to public, government entities." *Id.* Notably, we've declined to adopt any exceptions to the intracorporate conspiracy doctrine when corporate employees conspire for their own personal benefit or when they engage in a criminal conspiracy. *Id.* at 769–70; *see also Grider v. City of Auburn*, 618 F.3d 1240, 1263 (11th Cir. 2010) ("Because none of the exceptions discussed in *Dickerson* would apply on the facts of this case, we, like the Court in *Dickerson*, do not reach the issue of whether to adopt them.").

Here, the district court properly granted summary judgment as to his § 1985 civil-conspiracy claim. Even if he could show -- and we do not conclude that he did -- that racial animus motivated the ADMH defendants' actions, his claim is barred by the intracorporate conspiracy doctrine. Under this doctrine, the ADMH defendants could not conspire with each other while performing their duties as ADMH employees. *See Dickerson*, 200 F.3d at 767.

As for his § 1986 claim, Williamson does not raise it on appeal, and, therefore, he has abandoned the issue. *See Sapuppo*, 739 F.3d at 680 ("When an appellant fails to challenge properly on appeal one of the grounds on which the district court based its judgment, he is deemed to have abandoned any challenge of that

ground."). But regardless, the district court properly concluded that his § 1986 claim necessarily failed because he did not have a viable § 1985 claim. *See Park*, 120 F.3d at 1160 ("The text of § 1986 requires the existence of a § 1985 conspiracy."). We affirm the district court's order as to Williamson's civil-conspiracy claims.

## VII.

Broadly speaking, Williamson also says that the district court failed to follow proper procedures in granting summary judgment as to all of his claims. We disagree. Under Federal Rule of Civil Procedure 56(a), a party may move for summary judgment, identifying each claim or defense on which it is sought. Further, "[a]fter giving notice and a reasonable time to respond," the district court may grant summary judgment "on grounds not raised by a party." Fed. R. Civ. P. 56(f)(2). However, a district court commits reversible error if it fails to give a party notice that summary judgment might be entered against it. *Ga. State Conf. of the N.A.A.C.P. v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1344 (11th Cir. 2015). That said, a failure to give notice can be harmless error when a party is not deprived of the opportunity to present facts or arguments that would have precluded summary judgment. *See Restigouche, Inc. v. Town of Jupiter*, 59 F.3d 1208, 1213 (11th Cir. 1995) (affirming where a plaintiff never argued on appeal that additional evidence existed that created a material issue of fact).

When a party moves for *final*, not partial, summary judgment, "it becomes incumbent upon the nonmovant to respond by, at the very least, raising in their opposition papers any and all

arguments or defenses they felt precluded judgment in the moving party's favor." *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) (quotations and brackets omitted). "A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions." *Id.* (quotations omitted). So, if an issue is not raised on summary judgment in the district court, it may be deemed waived or abandoned. *Id.*

The Supreme Court has stressed that courts have the inherent power to "manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962). Further, if a case is "tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately," either "on the record after the close of the evidence" or "in an opinion or a memorandum of decision filed by the court." Fed. R. Civ. P. 52(a)(1). However, "[t]he court is not required to state findings or conclusions when ruling on a motion under [Rule 56]." *Id.* 52(a)(3).

Here, Williamson raises several general challenges to the district court's order, but none of them pass muster. For starters, his initial brief says, in passing, that the district court improperly granted summary judgment as to all of his claims, even though the defendants and the court did not address some of these claims. In his reply brief, Williamson adds that he did not abandon this issue on appeal because he listed it in his initial brief. But as we've made clear, "simply stating that an issue exists, without further argument

or discussion, constitutes abandonment of that issue." *Singh*, 561 F.3d at 1278. Nor has Williamson clarified how the defendants' omission of the claims affected the district court's order. Indeed, it is unclear which claims he thinks were not addressed in the district court. As the record reflects, he raised 19 causes of action, each of which incorporated by reference over 400 paragraphs of factual allegations, and he does not say which allegations pertained to the allegedly unaddressed claims. *See Sapuppo*, 739 F.3d at 681; *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1320 (11th Cir. 2006) (noting that our duty to liberally construe a *pro se* plaintiff's complaint does not include the duty to re-write it).

But even if Williamson did not abandon this argument, any failure by the district court to give notice of its intention to consider whether all of his claims survived summary judgment was harmless. As the record reflects, the ADMH defendants moved for summary judgment as to *all* of Williamson's claims, and he filed a response and sur-reply in opposition, so he was not deprived of the opportunity to present all of the facts or arguments that would have precluded summary judgment. *See Restigouche*, 59 F.3d at 1213. Further, although we liberally construe *pro se* pleadings, Williamson's *pro se* status does not excuse him from articulating on appeal whether additional evidence existed that would have created a material issue of fact. *See Albra*, 490 F.3d at 829.

Williamson also claims that the district court made credibility determinations when ruling on summary judgment, but we find no support in the record for this claim. According to the Supreme

Court, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," so long as there is no genuine issue of *material* fact. *See Anderson*, 477 U.S. at 247–48. Williamson has not directed us to any genuine issues of material fact disregarded by the district court in ruling on summary judgment.

Williamson adds that the district court erred in granting summary judgment because, in his words, the district court committed "inadvertence" by maintaining a preconceived notion that he had a minimal chance of surviving summary judgment as a *pro se* litigant. But he provides no support for this claim, and nothing in the record indicates that the district court actually was biased against him. To the extent he says the district court delayed review and extended deadlines, the court had the inherent power to manage its docket to achieve the orderly and expeditious disposition of his case. And to the extent he argues that the district court failed to comply with Rule 52(a)(1), his argument is meritless. This is because the district court was ruling on a summary judgment motion under Rule 56, so Rule 52 simply did not apply. *See* Fed. R. Civ. P. 52(a)(3). We affirm the district court's order in this respect as well.

## VIII.

Finally, the district court did not abuse its discretion in dismissing Williamson's state-law claims. We've long "encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004). Here, the

district court dismissed Williamson's federal claims over which it had original jurisdiction. Thus, the court acted well within its discretion in declining to exercise supplemental jurisdiction over his remaining state-law claims. *Id.*

In sum, we affirm the judgment of the district court.

**AFFIRMED.**